2266 Ali v. Hogan This court should give independent meaning to each section of the executive order that Governor Hogan issued. And when this court does that, it should start with the clearest section. Section B is the clearest section of the executive order and it should be interpreted to mean Israel. Why don't we start with the title because the title says it's a prohibition on discriminatory boycotts of Israel in state procurement. So right from the get-go, isn't this order telling us this is about discrimination within the state procurement process rather than what you buy a giant in your personal capacity? Well here in this particular situation because Saqib Ali is an individual, he's also a sole proprietor in the context of government contracting. So there is no distinction between his personal capacity and his professional capacity in this situation. And that's the exact same situation that the Texas court confronted in Amaui where it was a sole proprietor. How is his PDS activity related to his software engineering business? So right now Saqib Ali would like to bid on a state contract and he would like to use his software engineering expertise. But let's say, for example, one of the state contracts that he found was about life insurance. In order to analyze, to create a software program for analyzing the life insurance policies to provide a recommendation to the person, the state government that's in charge of that, he might have to acquire equipment. He would not acquire equipment from Hewlett Packard because of the work that they do with the Israel government. How far along did he get in the bid process? Did he get any further than just identifying projects as is alleged in the complaints? No, Your Honor. And the reason he didn't get any further than identifying projects is because the executive order itself flatly prohibits him from submitting a bid. He cannot, Section B itself says, that in order to bid, you have to be, quote, not engaging in a boycott of Israel. And you also have to, in signing that oath, you have to say, you have to promise that you won't boycott Israel, quote, for the duration of the contract. You'll refrain from a boycott of Israel. Those are things that Saccabelli just can't do. He can't do that because of his political beliefs around boycotting Israel. It just seems like he had no intent to bid, regardless. Otherwise, he would have when the district court told him to. And I think here the court should go back to the Supreme Court's oath cases. The district court, in that first order, did it without prejudice, ruled without prejudice, and explained to him what he needed to do to establish standing. Yes, Your Honor. If he wanted to seriously pursue the case, here's what you have to do to have standing to sue. That's a constitutional requirement. And he didn't do it. Your Honor, it's absolutely a constitutional requirement for Saccabelli to have standing. But in all the other anti-BDS cases, in every single one, the moment of standing is conferred when the oath is presented. And in this particular context, if the proponents of this anti-BDS measure were successful in the state law, and probably the oaths would have been contained in contracts that were with independent contractors. But instead, it was issued by the governor. And because of the governor's limited power in the state of Maryland, the anti-BDS provision only applied to state-level agencies. And so because it applied only to state-level agencies, the bid they could have, Governor organized the law so that the oath is taken upon executing the contract. But instead, Governor Hogan made it so that the oath is required upon submitting the contract. And so that's where the exclusion comes. And that's the big difference between this executive order and the law in Arkansas, the law in Texas. Am I misremembering? I thought in all those other cases, people did submit bids, sometimes without what you're referring to as the oath. But they submitted a bid. So why? What is going on here? Why is there no bid? No, Your Honor. So, for example, in Amaui, Representative McGeehan argued that case. She did have a course of conduct of dealing with Pflugerville School District. But the standing came when she was offered a future contract, and she refused to sign it. She didn't cross something out. She couldn't sign it because she was unwilling to sign an oath. And the court's analysis in Amaui is... I don't understand how that has to do with why he didn't bid to establish standing as the district court told him he should do. Well, there's two reasons. One, and I think the Supreme Court's decision in Cramp and the oath cases that the Supreme Court deals with are telling here. The reason he didn't submit a bid is because he can't sign the oath. He cannot say that he is not boycotting. He is refraining from boycotting Israel now because he is. But hang on a minute. Yes, Your Honor. There's no allegation in the complaint, I don't think, in the district court found, there wasn't, and I didn't see one, that he is, within the context of the procurement process, discriminating based on Israeli national origin. I thought the only allegation was he doesn't buy Sabra and he doesn't buy SodaStream when he shops for himself because of the connection to Israel. So I don't understand why he can't sign the certificate. It's not just that the district court is telling him to bid. It's that he's got the governor and the AG in court telling him, go ahead, sign the certificate. We don't think you're doing anything that constitutes a boycott of Israel. So I guess maybe I'm just rephrasing the same question. Sure. Can't this guy take yes for an answer, sign the certificate, submit a bid, and then we'll see what happens. Yes. The reason, and I understand that the crux of this case is, does Saqib Ali, having not submitted a bid, does he have standing to challenge the executive order? And that should turn on the compelled speech. When he's signing an oath, he is taking a position on the propriety of boycotting or not boycotting the state of Israel. That is speech. And he is not willing to do that. And in Crip, the Supreme Court talks about people that have, you know, Saqib Ali is a former state of Maryland lawmaker. He takes his obligations to the state of Maryland seriously. He's civic-minded. He's not going to say something that's not true. And in his mind, and in the plain meaning of the text of the executive order, it says a bidder needs to sign something, and agencies may not execute a contract with someone unless they say in writing that they are not engaging in a boycott of Israel. And he can't say that. He can't say that, and so he can't submit a bid. And that is the compelled speech component of standing. It is similar to the other pieces. Just so I understand your argument, but the reason he can't say that is because on his reading of the executive order, when he doesn't buy Sabra, that is a boycott of Israel. No, Your Honor. It's not just limited Sabra. I'm just using Sabra as an example of something one might purchase, and the one that is in the complaint as an example of something one might purchase in his or her personal capacity. That is an example of something that he would not purchase in his personal capacity as an expression of his bevious activism. I don't mean to minimize the importance of his personal boycott, but the reason he thinks he can't sign the certificate is because he believes it covers his personal boycott activity. And would, yes, and would cover any business activity he does with the state of Maryland. But none of that, but he has not alleged in his complaint any desire to, and again, I boycott Israel in the context of the procurement process. That's not in his complaint. And the reason there's nothing specific to a bid in his complaint is because he's disqualified from bids across the board. There's no caveats to the disqualification. And there is First Amendment doctrine that allows for pre-enforcement challenges, and I think that doctrine really fits this particular situation here because it's not just whether or not, and there's a lot of back and forth between the parties about what the executive order does, what it doesn't do. But it's, but again, if you go back to Section, if you go to Section C, and the Section C has the text of a oath that the governor of the state of Maryland imposes, even if you look at it and you limit it to in preparation of the bid, if that's the only, if that's the only scope that this court believes that the executive order covers, in preparation for a bid would require SACIB not being categorically excluded from bidding on anything. And if that categorical prohibition is removed, then SACIB could identify a contract, something that he wanted to bid on, and he could then put together a bid. And what he's saying in the complaints is that he adheres to BDS principles, which means that if he's putting together a software system for a government agency, maybe he won't use a website, a platform that folks use to build online shopping websites. It's a company with connections to the Israeli government. Maybe he won't use that. He won't buy certain technology from Hewlett Packard. And those, that would be him putting together a bid and having that bid process reflect his BDS beliefs. But instead, what the district court wants to do, and it seems that the panel has... Is the relationship between his BDS activity and his software engineering business, is that alleged somewhere in the complaint? What you've just said, is that somewhere in the complaint? Well, it's synonymous because he doesn't have a separate entity. There's no separate entity. And for both executive order as well as procurement processes in Maryland, you can be a sole proprietor. And this issue of in your personal capacity versus your business capacity, this exact issue arose in the Amaui litigation. And when it comes to sole proprietorships, I think in specific, when it comes to sole And in your business capacity vanishes because a sole proprietorship is the same. I don't understand that. As I read the executive order, it's just saying that when you deal with subcontractors and vendors and suppliers in the process of submitting your bid to the state, you can't engage in what we'll call a boycott of Israel. But when you go to Giant to do your grocery shopping, do whatever you want. And I understand today your argument that actually your client would like to boycott Israel in connection with his bid. He wants to pick suppliers and vendors based on their connection to Israel. But I don't see that in the complaint. And the district court said also, I don't see that in your complaint. So I don't know what we're supposed to do with that now. The only thing I see in the complaint is in my personal capacity, by which I mean as a sole proprietor, but not putting together a bid for state procurement. My other purchasing decisions, I would like those to be informed by my BDS activity. But I don't see anything about, I want to pick my suppliers and vendors based on their connection with Israel. If that's the difference between standing and not standing... The district court said that was the difference between standing and not standing, and it's not like anyone said, then let me amend my complaint. Well, we do think that it is important for the Fourth Circuit to not allow the state of Maryland or anybody else to impose loyalty oath requirements on any residents of state of Maryland, anybody that wants to contract with the state of Maryland. And it's also, if you go to Section C, and this is where vagueness I think is really important here. If you go to Section C, it's not just, there is an argument back and forth, and obviously the state of Maryland is saying that this is their official position. But yes, yeah, the first sentence, there's that in preparing its bid clause that they want to describe the 68 other words that follow. But look at that last clause after the comma where it says, for taking other actions intended to limit commercial relations. That's a phrase that we've seen in a lot of these anti-BDS laws, and that's a phrase that's intended, we believe, and the plain meaning of that is that it encompasses speech and the other purely expressive actions that comprise boycotts. And then to the extent, to the extent that there's vagueness here, that that's a basis for standing because, again, the district court wants to read Section B completely out of the executive order. And there's no way to do it because if you go back to the district courts, remember the district court issued two motion to dismiss decisions. One in October 2019 and one, I believe, earlier this year. And the first motion to dismiss decision, one of the things that she said in distinguishing Section B and Section C is that Section B has a present tense requirement, you are not engaging in a boycott of Israel. It has a future tense requirement, you will not engage in a boycott of Israel for the duration of the contract. And then C has a retrospective look at what you have done in the past. Those are three different things, and those are three separate requirements, and because an agency may not execute a procurement contract with someone that doesn't satisfy either point A, point B1, or B2, that means that it would be futile for Saqib Ali to apply for a contract because he wouldn't qualify for it. And the plain meaning of Section B dictates that outcome. Thank you, Your Honors. I'm sure we have time for a rebuttal. Thank you. You saved some time. Yes, sir. Mr. Schneider? Good to have you with us, sir. Through your questioning, you've already touched on the absence of actual injury here. Also, counsel has touched briefly upon other ways to obtain a reinforcement review, like through chilling or through a credible threat of prosecution. He more or less disavowed those theories of standing in his brief by accusing the district court of having tried to shoehorn his arguments into that, those standing theories. I think all of his eggs are in the loyalty oath basket and the cramp case. And the cramp case does say that when faced with a constitutionally vague oath, that one does have standing to challenge it without having to sign it first. But this is a very, very different case than cramp. Cramp involves a classic loyalty oath. It requires public employees to swear their faith in the United States and to forswear giving any aid, abetting, support, or influence to the Communist Party. And the Supreme Court wondered aloud, what do these words mean? Could it mean that if you support any type of issue that the Communist Party also supports, that you run afoul of this provision? The court concluded that those terms were incapable of objective measurement. And now you switch to paragraph C of this executive order, which is, is the only certification that would-be vendors have to sign in Maryland. And it couldn't be more different. It's very narrowly drawn, focused in multiple places. Counsel, why isn't that a merits argument? I understand your argument for why this oath is not vague. It's less ideological. It's narrowly drawn. But that just seems like that's a reason why it would survive merits review. It doesn't seem like a distinction as to standing. When we're talking about standing under cramp and that kind of loyalty oath line of cases, I think in that context, vagueness, the merits of vagueness tends to bleed into the standing inquiry. Because the idea is that if the oath is so incapable of understanding, that someone can't be required to sign it because they really don't know what they're signing. So I agree that we're here only on standing. But I do think when we're talking about the loyalty oath, the merits tend to creep in. At least that's how I read cramp. But this is not a loyalty oath in any sense of the term, either in cramp or in conal, another case that plaintiffs cite that focuses on kind of ascribing to certain belief systems. This is very focused on the Maryland procurement process and just requires people to acknowledge and to state that they're not engaging in national origin discrimination. The government had not disavowed Section B at the time of the filing of the complaint. So what is your argument that there was no chilling effect between the filing of the complaint and when the state decided to disavow Section B? Well, it's always been a fact that Section C is the only certification that people are required to sign. But otherwise, in response to your question, can I ask you to restate your question? Yeah. When appellant filed the complaint, Section B, the governor was rah, rah, all about the executive order. This is going to strike a blow to BDS activity. So Section B was still in there at that time. So why was that not a chilling effect on appellant's speech at that time, before attorneys got involved and decided Section B can't stand? Let's assume C is not even in this executive order. All we're looking at is B. Even when you read the definitional sections into B, it is clear that it only would address business decisions. That's through the definition of commercial activities and some of the other terms in there. And Mr. Ali's complaint does not allege that he engages in, certainly not in discrimination against Israeli suppliers and vendors and subcontractors in the procurement process, and alleges affirmatively that all he does is boycott in his personal capacity. He draws a very clear line between personal capacity and business decisions. And he kind of has to do that, I think, because the general nondiscrimination provision that exists later on in the package of materials that one has to sign, I'm not sure how he'd be able to sign that if he were discriminating against contractors, vendors, and subcontractors, vendors, and suppliers on the grounds of the fact that they're Israeli. That would be national origin discrimination. So I don't think he can engage in that type of discrimination. I think that's why it's not in the complaint. Can I ask you just a question about your reading of the executive order? So is your position, how important for you is the governor's disavowal of Mr. Ali's reading of the executive order? Is your position that, look, this executive order is clear on its face, it doesn't cover personal capacity activity, or are you relying at least in some measure on sort of deference to the governor? It's his order and it means what he says it means. Two-part answer. One is that, again, it's conceded here that Section C certification is the only one that would-be vendors are confronted with and have to sign. B does not appear. They don't have to sign anything with respect to B. So as a factual matter, you don't even have to get to the governor's interpretation of Section B, unless by your question it's whether the governor's confirming that that's the only thing you have to sign. So I think, first of all, it's factually conceded that C is the only one that anyone needs to sign. Once we get to construing B, if B were something that people also had to sign, well, then the governor's disavowal of-the governor's position that B wouldn't obstruct Mr. Ali from bidding on contracts would then become kind of more front and central to this case. Would you need it or do you think B is clear by itself? I think it's clear that it only reaches business activities. And given the allegations of the complaint, I don't see how Mr. Ali gets there. If we wanted to go and talk about other scenarios, B is a little bit different from C. It uses different words. But it's pretty clear, I think, that C and B are both focused on business activities and Mr. Ali, in his complaint, does not allege that he engages in discrimination in that context. I just wanted to say one very brief point about Ex parte Young and the 11th Amendment. And that's that I like to keep in mind when I'm thinking about Ex parte Young questions, the whole reason why we have Ex parte Young, which is to separate suits against state officials from suits against the state as a sovereign entity. And so the whole point of Ex parte Young is to find the official within the state system that is making the decision that is causing the injury to the plaintiff. And that does two things. One is that normally it finds a lower-down state official, so you're not forever enjoining the governor and the attorney general, because we know from these cases that governors and attorney generals are always named as defendants. But also it would give effect to the court's injunctive powers, because you need to identify the state official who actually can remedy the injury that the plaintiff has suffered. So in this case, if Mr. Ali had submitted a bid, and if it had been denied, we would know who the official is that needs to be enjoined if the court were to conclude that the certification of the executive order was unconstitutional. We would know who that official is that needs to be enjoined in order to give Mr. Ali the relief he seeks. It's not just enjoining the governor or the attorney general. And it would be because, as I understand it, the order identifies the people who are going to enforce it are the heads of the agencies who either give someone the contract or don't. Yes. Okay. I understand what you're saying, but I did want to give you a chance to address what seems to me like just a teeny bit of tension between your arguments on the standing side and then your arguments on the Eleventh Amendment side. Because over on the standing side, you, at least in your brief, are relying pretty heavily on the governor and the AG disavowing any interest in enforcing this against private activity. But then over on the Eleventh Amendment side, you're saying, these people don't have anything to do with enforcement. Why are you suing them? So, yeah. But why don't you just thread that needle for me? Maybe it's a distinction between interpretation and enforcement. We're saying that the attorney general and the governor do not interpret the statute that way or the executive order that way. We read Section C. We know that Section C is a fact. It's the only one that people are required to sign and that B doesn't have anything to do with it. So it's disavowing the broad interpretation that Mr. Ali is asserting in an effort to establish a standing here. Now, the attorney general does have some enforcement powers here. I don't want to run from that. If Mr. Ali discriminated against Israeli subcontractors in the formation of a bid but certified that he didn't, well, that could form the basis for an enforcement action by the attorney general, who has the authority to bring suits against people who falsely certify in the procurement context. But again, in this context, Mr. Ali has alleged that he only doesn't contract with Israelis in his personal capacity and not in his business capacity. So there's no risk of a false certification here that would implicate the AG's enforcement authority. Really, the disavow point more goes to an interpretation of C, what the state's view is that this means, and as the district court confirmed, that it thought that that was the plain language dictated that result and that the state's interpretation of it is the most reasonable. Unless the court has further questions? Thank you. Thank you very much, sir. I appreciate it. Points, Your Honor. Mr. LaBosche, go ahead. Thank you. The first is that in Cramp, Supreme Court case, the same argument that my colleague on the other side made was made there, too. Quote, the argument is made, however, that self-exonerating sworn statements, and in this case it would be I'm doing the boycott in my personal capacity, conclusively demonstrate that this appellant could not possibly sustain injury. Essentially, the state of Maryland is saying what the losing party said in Cramp, that they could sign the loyalty oath and they comply with it. There's nothing inconsistent about their lives with the content of the loyalty oath. But the Supreme Court looked at that loyalty oath and said we're not, it's irrelevant whether they can or can't actually sign it, consistent with what they're doing. The issue is the fact that they're having to sign the loyalty oath. So when we get to Colby Richardson, another loyalty oath case, this one about state workers and a loyalty oath about not overthrowing the government, the Supreme Court specifies that the concern about vagueness is particular in the oath context. Quote, concern for vagueness in the oath cases has been especially great because uncertainty as to an oath's meaning may deter an individual from engaging, unquote, in constitutionally protected activities. That's this situation. Saakib Ali is not willing to sign an oath that disavows his longstanding political beliefs. And he's not just some fly-by-night passerby. He is a person that for two years when the legislature was considering an anti-BDS law helped lead the opposition to that law. And then now we see an executive order and he's interested, civic-minded as he is, in keeping the bid process open to everybody. And as an entrepreneurial, civic-minded man sees an opportunity to engage in contracts. That second part is really important to you because I thought you were about to go off on a track where you don't want to be, that this is someone who has deeply felt and generalized concerns with this executive order because that's the concern here, right? He's never submitted a bid before. He hasn't submitted a bid yet. Everyone's telling him to submit a bid, but he won't, which gives rise to at least a concern that this is less about a desire to participate in the contracting process and more about opposition ideologically to this order. Yes, Your Honor, that is a fair concern, but that is a summary judgment concern. At the motion to dismiss stage, Saakib Ali is stating emphatically he will put together a bid. He's identified several bids. Obviously, those have come and gone. He will put together a bid. The thing that's stopping him from putting together a bid is the thing that he has to attest to on the bid itself. That is the impediment. But put together the bid and don't sign it and see what the state does. But we know what the state will do. I don't know what the state will do. I don't have the statute in front of me, but it is an incomplete bid. Section B and Section C make it clear that you have to sign it. Section B says, on one hand, that the agency can't execute an agreement unless it's signed. Section C says, on the other hand, that people submitting the bids have to sign. This is important. This was a supplement to the appendix. The last statement that the state of Maryland has made about the meaning of the executive order came a few months ago when Ben and Jerry stopped selling ice cream to the West Bank and other occupied territories. If you reject the bid, then you have standing. Well, I would love to represent Ben and Jerry. Probably not. The issue is, what is the state of Maryland's understanding of the meaning of the executive order? When that issue came up, the Secretary of State sent out a letter that was made public on behalf of the entire administration that they're going to review Ben and Jerry's contracts because they viewed the activity of stopping selling ice cream in the West Bank, which was a decision. It's not a discrimination decision based on a person's national origin. It's a decision to stop selling ice cream in a particular place. And they said that that was subject to the executive order. That is unopposed. It was agreed to in the appendix. And it's the last word on what the state of Maryland means. Thank you, Your Honor. Thank you very much, sir. We appreciate the arguments of counsel. And if it wasn't for the circumstances, we would come down and greet each of you personally and shake your hands. But in the circumstances, we won't be able to do that. But we're glad to have you here. You both did a fine job. Thank you, Your Honor.
judges: Robert B. King, Stephanie D. Thacker, Pamela A. Harris